1

2

3

4

5

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

6   RAFAEL RIVERA,

7                         Plaintiff,

8       v.

9   WILLIAM J. MCGAFFEY, ROZELL
TOWNSEND, LINDA ALLEN, LT.

10  DUNINGTON, K. ARLOW, DOUG
WADDINGTON,

11

12                      Defendants.

NO. C11-5942 RJB/KLS

**REPORT AND
RECOMMENDATION NOTED
FOR:  JUNE 14, 2013**

13

14           Before the Court is Defendants' Motion for Summary Judgment.  ECF No. 48.

15  Defendants served Plaintiff with a *Pro Se* Prisoner Dispositive Motion Notice consistent with

16  *Woods v. Carey,* 684 F.3d 934, 935, 940-41 (9th Cir. 2012) and in accordance with the holding

17  of *Rand v. Rowland,* 154 F.3d 952, 962-63 (9th Cir. 1998).  ECF No. 49.  Plaintiff Rafael

18  Rivera filed a Motion for Summary Judgment (ECF No. 51) and a response to Defendants'

19  motion (ECF No. 52).  Defendants filed a response to Plaintiff's motion (ECF No. 53) and a

20  reply to Plaintiff's response (ECF No. 55)[1].

21           Rafael Rivera is a pro se prisoner who is currently incarcerated at the Coyote Ridge

22  Corrections Center (CRCC).  While he was incarcerated at the Washington Corrections Center

23

24           [1] Defendants stated that they had no objection if Plaintiff wished to request an extension of time to file a
25  reply to their response to his motion for summary judgment because they did not send Defendant Waddinton's
responses to Plaintiff's interrogatories to Plaintiff until May 2, 2013.  ECF N. 55, at 6 fn 2.  Plaintiff did not file a
reply or request an extension of time to file a reply.

26

REPORT AND RECOMMENDATION - 1

(WCC), Mr. Rivera participated in a tier-group meeting as tier representative.  Based on that meeting, Mr. Rivera was investigated for organizing the collective filing of grievances and issued a 652 infraction for engaging in or inciting a group demonstration.  After an infraction hearing, Mr. Rivera was sanctioned with segregation, loss of good conduct time, and was transferred from WCC to CRCC.  The infraction and punishment were subsequently expunged after Mr. Rivera filed a personal restraint petition in state court.   Mr. Rivera claims that he was the victim of retaliation because just two days before he was infracted, he complained about the conduct of two WCC officers.  He also claims that his speech in the tier  and other meetings with prison administration are protected by the First Amendment.  Further, Mr. Rivera claims that he was denied due process in his infraction hearing and that Defendants conspired against him.  He seeks a declaratory judgment, $10,000.00 in compensatory damages, and $1 million in punitive damages.

Included in the relief portion of Mr. Rivera's complaint is the statement:  "Plaintiff has also been suffering from constant severe pain in the neck, shoulder and arms since transport to Coyote Ridge."  ECF No. 5, at 14.  Mr. Rivera included no factual allegations or constitutional claim related to this statement and a subsequent motion to amend to include an injury claim against the Defendants in this case (ECF No. 37) was denied.  ECF No. 41.   In the caption of the complaint, Mr. Rivera cites to 42 U.S.C. §§ 1985(3), 1986, 1988, and 1997.  ECF No. 5, at 1.  Mr. Rivera included no factual allegations to support a conspiracy claim.  Neither Mr. Rivera nor the Defendants raise the issue in their summary judgment motions.  Further, as discussed herein, Mr. Rivera has failed to establish that he was deprived of a legally protected right as a result of any alleged conspiracy to retaliate against him.

Having reviewed the motions, supporting declarations, and balance of the record, the

Court recommends that Defendants' motion for summary judgment (ECF No. 48) be granted

and Plaintiff's motion for summary judgment (ECF No. 51) be denied.

**FACTS**

**A.    January 18, 2010 Tier Meeting**

Mr. Rivera resided in Cedar Hall during the time he was at WCC.  Inmates in Cedar

Hall are classified as Medium Custody.  The unit consists of four dayrooms, each with two

tiers.  Each tier has 15 2-man rooms holding a total of 60 men.  ECF No. 48-1, Exhibit 2,

Declaration of Linda Allen, Cedar Hall Custodial Unit Supervisor (CUS), ¶ 7.   The inmates of

the two tiers in Cedar Hall select one inmate as their "tier representative," whose duty it is to

bring concerns and issues of the tiers to the Residential Unit Action Committee (RUAC).  The

purpose of the RUAC is to allow the offenders to bring up issues to the CUS at regular

monthly meetings.  The tier representatives are to determine the concerns of their fellow

inmates by posting a sheet of paper on a bulletin board in the dayroom of the tier.  The

offenders on the tier write issues and questions on the paper and the tier representative brings

the paper to the RUAC meeting.  Tier representatives may also hold meetings, but must first

seek permission from staff to hold the meeting.  They must also have a corrections officer

present at any such meeting.  *Id.*, ¶ 9.

Mr. Rivera was the representative for Tiers G and H (60 inmates).  On January 17,

2010, Mr. Rivera, and three other tier representatives, Larry Ballesteros, Richard Rusher, and

Erick Shrefner, attended a meeting called by Martin Dozier, the unit meetings coordinator.

Officer Martin Dozier was the liaison for the tier representatives and the Cedar Hall CUS

Linda Allen.  ECF No. According to Mr. Rivera, Mr. Dozier instructed him and the other tier representatives to hold a tier  meeting in anticipation of the January 20, 2010 RUAC meeting. The intent was to minimize the number of repeat questions occurring on prisoner complaint sheets and to separate out those questions that were directed to store and kitchen representatives.  ECF No. 5 (Complaint), at 4.

Mr. Rivera held a tier meeting on January 18, 2010.  ECF No. 5 (Complaint), at 4; ECF No. 48-1, Exhibit 1, Declaration of William McGaffey, former WCC Corrections Officer. CUS Allen states that Mr. Rivera did not receive pre-approval for the particular time and date of his meeting, she was not aware of the meeting until after it occurred, and Mr. McGaffey should not have allowed the meeting to occur after receiving only Mr. Rivera's verbal statement that the meeting was going to occur on that date.  ECF No. 48-1, Exhibit 2, Allen Decl., ¶ 11.

Mr. Rivera states that during the January 18, 2010 meeting, he "reminded all fifty nine inmates on the tier that 'if they were not satisfied with the answers to their complaints on the changes in policy, WCC procedure or staff issues' that they had the right to use the DOC/WCC grievance policy 550.100."  ECF No. 5, at 4.  According to Mr. Rivera, tier representatives are told to relay this to other inmates and that Corrections Officer McGaffey "repeated this same fact to the inmates."  ECF No. 5, at 4.

Mr. McGaffey states that he only observed the meeting and did not state any facts or answer any questions during the meeting.  ECF No. 48-1, Exhibit 1, McGaffey Decl., ¶ 4.  He specifically states that he never mentioned the grievance program to any inmate because they never asked him.  According to Mr. McGaffey, Mr. Rivera encouraged all the inmates to

grieve the loss of 15 minutes of gym time and a change in their movements.  Inmate Swanger then left and brought back grievance forms.  Mr. McGaffey states that the meeting was then over and he left the day room area and has no knowledge of what occurred thereafter.  *Id.*  Mr. McGaffey did not observe any problems with the conduct of the inmates during the meeting. ECF No. 51-1, at 7 (McGaffey Answers to Interrogatory No. 11).  When Sergeant Townsend returned to the unit after B-Side dining, he saw Officer McGaffey standing in the dayroom during the January 18th tier meeting in Cedar Hall.  He did not witness any problems with the meeting.  ECF No. 51-1 at 13, 15 (Townsend Answers to Interrogatories).

According to an inmate who was in the meeting and contacted Chief Investigator DeMars as a confidential informant (CI), Mr. Rivera and Swanger encouraged all the offenders in the day room to file grievances on the same issue and that they filled out the grievance forms for other inmates to sign.  ECF No. 48-1, Exhibit 3, Declaration of Steven DeMars, at ¶3.

Twenty-two grievances were filed by offenders in G/H tiers on January 18, 2012 regarding the loss of 15 minutes of gym time and the restriction of movement between activities.  ECF No. 48-2, Declaration of Tamara J. Rowden; Attachment A.

WCC Associate Superintendent states that in mid-January, she received a telephone call from Cedar Hill staff because the offenders of G and H tiers were very wound up and demanding to speak to the administration.  ECF No. 48-3, Exhibit 5, Declaration of Deborah J. Wofford; *see also* Exhibit 6, Declaration of Kerry Arlow, Attachment A, Disciplinary Hearing Appeal Decision, at 1 (bottom of page).   Mr. Rivera disputes that this occurred directly after his tier meeting.  However, the evidence reflects that this meeting would have had to occur between January 18, 2010 and the appeal decision on February 5, 2010 (as noted below,

Captain Wofford's recollection of this incident was taken into consideration for purposes of

Mr. Rivera's appeal).  In addition, Captain Wofford recalls being told on her arrival that the

agitation had resulted after an inmate had handed out many grievance forms to the others.  ECF

No. 48-3, Exhibit 5, Wofford Decl., at ¶ 9.

When Captain Wofford arrived in the G/H day room in response to the offenders'

demand to speak to someone in Administration, she found that tensions were very high and the

environment volatile.  ECF No. 48-3, Exhibit 5, Wofford Decl., ¶ 9.  She was told that

grievance forms had been handed out to the offenders some time prior to her arrival.  *Id*.  The

offenders were demanding to see someone from Administration because they felt WCC was

not being responsive to their issues.  *Id*.  They stated that they were very tired of the agency

continuing to take things away from them even though they were not being a problem and they

had earned trust with good behaviors.  *Id*.  It was apparent to Captain Wofford that the inmates

had been talking to each other and they were in a serious state of unease, which can provoke

unpredictable behavior.  *Id*.  At first the inmates were talking over each other to be heard,

many offenders throwing their arms in the air in a gesture of frustration along with multiple

comments from offenders such as "they are going to make us go off" and "you know what can

happen if you just keep taking things away from us" implying violence.  *Id*.

After some time, Captain Wofford was able to talk and reason with the G/H tier

inmates and that they eventually calmed down and were willing to have a discussion.  ECF No.

48-3, Wofford Decl., § 10.  Captain Wofford has thirteen years experience working in prisons

and during that time, she has found that one of the main causes of prison riots stems from

inmates being upset about changes to their routines, amount of privileges, and any aspect of

their prison lives.  She states that when inmates are already in a state of agitation and dissatisfaction, it can be easy to incite them to a collective physical reaction.  *Id.*

With regard to the G/H tier inmates, Captain Wofford states that prior to the January 18, 2010 incident, from September 2009 to early February 2010, Linda Allen replaced Karen Reese as the Cedar Hall CUS, the WCC administration started being stricter on existing rules, and CUS Allen reasserted rules in Cedar Hall.  The offenders were displeased with CUS Reese leaving and were hostile towards her replacement, CUS Allen.  By early January, Cedar Hall offenders had lost a number of privileges, including personal clothing, washers and dryers in the unit, and changes in their movement schedule.  ECF No. 48-2, Exhibit 5, Wofford Decl., ¶¶ 7,8.  They had also lost a fellow Cedar Hall inmate to suicide.  ECF No. 48-1, Exhibit 2, Allen Decl., ¶ 19.   Thus, according to Captain Wofford, the offenders' displeasure was compounded by the loss of time in the gymnasium.  ECF No. 48-3, Exhibit 5, Wofford Decl., ¶¶ 7,8.

Captain Wofford states that even three years after this incident occurred, she remembers the incident so clearly because the level of anger and frustration of the inmates in the G/H dayroom was the type that leads to violence and riots.  ECF No. 48-3, Exhibit 5, Wofford Decl., ¶ 10.

Although he was not present with Captain Wofford in the Cedar Hall day room, DOC Assistant Secretary in the Prisons Division, who has thirty years experience in the DOC prison system, shares Captain Wofford's concerns.  ECF No. 48-3, Exhibit 7, Declaration of Dan Pacholke, ¶¶ 2, 6.  He explains that the tier representative system has served DOC staff and inmates well for years as a sincere informed management tool, which also reassures the offenders that they will be listened to, which is important in reducing any volatile frustration

they may be feeling.  A representative like Mr. Rivera would gather information from his fellow offenders to serve as a communication function with facility management. The prison staff may also share a policy change, procedure or practice change with this group and request their thoughts and ideas.  In other cases, the tier representatives will share with management their observations about issues that are causing conflict with the offender population. Essentially this group can help inform decisions, assist with implementation or communicate why decisions were made to the broader offender population. *Id.*, at ¶ 5.

According to Mr. Pacholke, Mr. Rivera's actions were not consistent with those expected of a tier representative.  Instead, Mr. Rivera worked outside his role as a tier representative and misused his perceived authority among the offenders to rally offenders to protest a specific change in the offender movement schedule.  By soliciting or directing or offenders to all fill out the grievances or "nothing would change" he placed himself in a leadership role and encouraged a group demonstration to directly challenging WCC management.  These actions had the effect of encouraging dissatisfaction, resentment or hostility and leaving the offenders with the belief that collective action can assist them in achieving their desired outcome.  ECF No. 48-3, Exhibit 7, at ¶¶ 6-7.

On January 20, 2010, CUS Linda Allen held the monthly RUAC meeting with the tier representatives of Cedar Hall.  Mr. Rivera was present on behalf of G/H tiers.  Ms. Allen states that the inmates of Cedar Hall were quite upset because they had lost privileges as of January 1, 2010 (personal clothing, washings and dryers, etc.) as reflected by the minutes of the meeting and the list of complaints.  According to Ms. Allen, if an issue was raised in a meeting, it would generally be recorded in the minutes except that complaints about personnel

are not included in the minutes.  The minutes for the January 20, 2010 RUAC meeting reflect one concern raised by Mr. Rivera on behalf of G/H tier – a question about the quality of headphones listed on the approved vendor list versus the ones sold in the inmate store.  ECF No. 48-1, Exhibit 1, McGaffey Decl., at Attachment A.

According to Mr. Rivera, he orally complained about two staff personnel during the RUAC meeting:  (1) William McGaffey had been opening personal mail of "inmates" and showing their contents to other inmates (including a semi-nude photo of an inmate's wife), and (2) Sergeant Rozell Townsend was entering cells and removing items without a search report.  ECF No. 5, at 5.  Mr. Rivera also told CUS Allen that her meetings were becoming fruitless and that "it seemed like the complaints against staff never leave her office." *Id.*   It is unknown which inmate or inmates originally made the complaints against Officers McGaffey and Townsend and whether formal grievances were ever filed.

According to Officer Allen, complaints brought against staff are not included in the minutes of the RUAC meeting and she has advised tier representatives that staff issues or personnel actions cannot be discussed with them.  ECF No. 51-1, p. 23 (Allen Answers to Interrogatories); ECF No. 48-1, Exhibit 2, ¶ 13.

In his answers to interrogatories, Officer Townsend states that his supervisor CUS Allen asked him if he was taking contraband from cells without leaving a search report.  He explained that he was taking nuisance contraband from the cells during a tier check and that it was fruit taken from the dining area.  He also explained that the fruit was disposed of per contraband disposal policy.  CUS Allen directed him to review the search policy to verify his actions.  After he reviewed the policy it was determined that a Search Report was to be left in

the cell if contraband is removed.  His actions were immediately corrected and no further corrective action was needed.  He does not recall the date of his conversation with CUS Allen. He does not recall being informed that Mr. Rivera lodged the complaint or that other offenders lodged the complaint.  ECF No. 51-1 at 14 (Townsend Answers to Interrogatories).

In his answers to interrogatories, Officer McGaffey stated that he was informed by a female supervisor, whose name he doesn't recall, that an inmate named Zachary Gurwell had made a complaint about him.  It was never brought to his attention that the complaint arose at a RUAC meeting at Cedar Hall.   Mr. McGaffey further states that he had no input into the decision of placing Mr. Rivera or Mr. Swanger in the IMU.  He only wrote an incident report of what occurred during the tier meeting and gave it to Sgt. Townsend to be sent to I&I.  ECF No. 51-1 at 6.

Shortly after receiving the tip from the CI who attended the G/H tier meeting on January 18, 2010, WCC's Chief Investigator Steven DeMars discovered that many grievances had been filed.  ECF No. 48-1, Exhibit 3, Declaration of Steven DeMars, at ¶3.  After comparing Mr. Rivera's handwriting on his grievance form to that on other offenders' forms and to other Department of Corrections (DOC) records containing Mr. Rivera's handwriting, Mr. DeMars determined that Mr. Rivera had written some of the forms signed by others.  *Id.* at ¶4 and ¶5; *see also* ECF No. 48-2, Exhibit 4, Declaration of Tamara Rowden.  Chief Investigator DeMars believed this is evidence of Mr. Rivera's attempt to "pump up" a group of offenders into a collective cause against the prison administration.  ECF No. 48-1, DeMars Decl., Exhibit 3 at ¶5.

**B.      Disciplinary Infraction**

The investigation of Mr. Rivera, which began when the CI notified the WCC Chief Investigator, was continued by Sergeant Townsend.   ECF No. 48-1, Exhibit 3, DeMars Decl., and ECF No. 48-3, Exhibit 8, Declaration of Rozell Townsend.  Pending the investigation, CUS Allen placed Mr. Rivera into segregation on January 22, 2010 based on information she received that Mr. Rivera and inmate Swanger were getting the inmates wound up and angry. ECF No. 48-1, Exhibit 2, Allen Decl., ¶ 14.  Based on confirmation that Mr. Rivera had authored some of the grievances, the CI statements, and Officer McGaffey's incident report, Sergeant Townsend issued a 652-infraction for engaging in or inciting a group demonstration (WAC 137-25-030) to Mr. Rivera and inmate Swanger.  ECF No. 48-3, Exhibit 8, Townsend Decl., ¶¶ 4-5.

Hearing Officer Tony Dunnington conducted Mr. Rivera's infraction hearing on January 27, 2010.  ECF No. 48-3, Exhibit 9, Declaration of Tony Dunnington, Attachments A (Disciplinary Hearing Notice) and B (Serious Infraction Report).  Mr. Rivera received notice of the hearing and infraction and did not request any witnesses.  *Id.*, ¶ 3, Attachments A and B. According to the Serious Infraction Report, after Mr. Rivera was advised of his right to remain silent, he made the following statement:

> As a tier representative, I did not talk about or advise any inmates on any type of activity that is different from what we always address.  We discussed the usual; not getting enough gym time, laundry, clothing being taken away, etc. We have been talking about these issues for several months.

ECF No. 48-3, Attachment B, at 27.

Mr. Rivera acknowledges that he received notice of the hearing, waived his rights for the specific accusations he was facing, and was allowed to make defense statements "as

required by procedure." ECF No. 5, at 6.  Mr. Rivera states that he said "there is no crime in promoting the grievance policy, and that he is always reminded by staff to make the statement 'if you don't like it grieve it,' when the other inmates are not satisfied with the answers that plaintiff must relay from staff." *Id.*

During his deliberations, Hearing Officer Dunnington contacted CUS Allen by telephone.  She informed Officer Dunnington that Mr. Rivera did not have staff permission to hold the tier meeting, although she acknowledged that he did approach a corrections officer just before calling the meeting.  She also told him that Mr. Rivera's actions and words to the offenders had them agitated against staff and WCC administration.  Hearing Officer Dunnington states that this information in combination with the infraction report demonstrated a type of activity that could cause a serious incident of out of control agitated inmates which would pose a serious threat to the safety and security of WCC inmates and staff.  ECF No. 48-3, Exhibit 9, Dunnington Decl., ¶ 4.  Officer Dunnington found Mr. Rivera guilty of the infraction and issued sanctions of 15 days segregation, 45 days loss of good conduct time, and recommended that Mr. Rivera be removed from Cedar Hall.  *Id.*, at ¶ 3; Attachment B.  Officer Dunnington provided the following reasons for the sanctions:  "this offense was severe and unique in nature that could possibly cause serious security and safety issues of the institution, staff and inmates." *Id.*

Mr. Rivera states that after he presented his defense that he was merely promoting the grievance policy, he was asked to step out of the hearing room while Officer Dunnington had a "clarification interview" with CUS Allen by telephone.  Thereafter, Mr. Rivera states that he was charged with having "an unauthorized meeting," that Officer Dunnington found him guilty

of "having an unauthorized meeting" instead of "telling inmates to grieve issues" without first allowing Mr. Rivera an opportunity to provide a defense to this "new charge."  ECF No. 5, p. 6.

Mr. Rivera appealed and on February 5, 2010, Associate Superintendent Kerry Arlow affirmed the Hearing Officer's findings.  ECF No. 48-3, Exhibit 6, Declaration of Kerry Arlow, ¶ 4.  Ms. Arlow considered the infraction packet from the hearings officer and also contacted Officer Dozier, who was the main contact with the tier representatives and Captain Wofford.  Officer Dozier told her that Mr. Rivera had improperly called an ad hoc tier meeting. She also spoke with Captain Wofford and was told that she had been called to Cedar Hall to calm down the offenders who were quite upset following the meeting.  Based on the new information, as well as the evidence before the Hearing Officer, Ms. Arlow affirmed the guilty finding, concluding: "[y]our actions could have caused serious safety and security issues."  *Id.*, ¶¶ 5,6; Attachment A (Disciplinary Hearing Appeal Decision).

Mr. Rivera alleges that at the time Ms. Arlow ruled on his appeal, she was aware that Officer McGaffey had attended, supervised, and assisted at Mr. Rivera's tier meeting and that the tier meeting had been authorized by Officer McGaffey.  He alleges further that Ms. Arlow then changed the charge against him from "having an unauthorized meeting" to "telling inmates to grieve issues" and found him guilty without having a new hearing on this "new charge."  ECF No. 5, at 7.

As a result of the infraction, Mr. Rivera lost 10 custody points giving him a total score of 52 points, which increased his level from minimum custody-level three to medium custody. ECF No. 48-1, Exhibit 2, Allen Decl., ¶ 16.  Mr. Rivera's custody facility plan review occurred

on February 18, 2010.  CUS Allen states that she did not participate in Mr. Rivera's re-

classification because she was no longer the CUS assigned to him.  According to her review of

DOC's electronic database, CUS Reese recommended Mr. Rivera's demotion from minimum

custody, level 3 (the most restrictive of the three minimum levels) to medium custody (less

than 40 points is close custody; 40-55 points is medium custody).  CUS Reese, Mr. Rivera's

counselor, and the Correctional Program Manager Jean Anderson recommended that Mr.

Rivera be transferred to Stafford Creek Corrections Center (SCCC) in Aberdeen.  Transfer

decisions are made by the Headquarters Classification and Transportation Units.  *Id.*

According to Ms. Allen, the decision to transfer Mr. Rivera to CRRC would have been based

on available bed space among the medium custody facilities statewide and any security

concern identified with Mr. Rivera remaining at WCC.  *Id.*, ¶ 9.  None of the Defendants

participated in custody classification or transfer decisions.  *Id.* at Attachment B.

On February 22, 2010, Mr. Rivera filed a personal restraint petition in Division II of the

Washington State Court of Appeals (No. 40372-2-II).  In April 2010, the State filed a response,

informing the court that the January 18, 2010 infraction was expunged from his file and 45

days good conduct time was restored and Mr. Rivera's Early Release Date was adjusted

accordingly.  ECF No. 5, Appendix H.  When the 652 infraction was expunged, ten points

would have been returned to Mr. Rivera potentially reducing his custody level back to

minimum.  ECF No. 48-1, Exhibit 2, Allen Decl., ¶ 16.

**MOTION TO STRIKE**

Defendants move to strike "all argument" from ECF No. 51 and ¶3 of ECF No. 51-2 as

well as Appendix I (Tort Claim to Washington State) and Appendix J (Letters with AAG Meyn

and Office of Financial Management Regarding Settlement), which are attached to Mr.

Rivera's complaint.  The only documents identified by Defendants relating to settlement

negotiations are contained in Appendix J.  Therefore, the motion to strike will be granted as to

those documents only.  The Federal Rules of Evidence bar the admission of evidence of

settlement negotiations to prove liability.  Fed. R. Evid. 408(a).

### SUMMARY JUDGMENT STANDARD

The Court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact, and the movant is entitled to judgment as a matter of law.  Fed.

R. Civ. P. 56(a).  The moving party has the initial burden of production to demonstrate the

absence of any genuine issue of material fact.  Fed. R. Civ. P. 56(a); *see Devereaux v. Abbey,*

263 F.3d 1070, 1076 (9th Cir. 2001) (en banc).  To carry this burden, the moving party need not

introduce any affirmative evidence (such as affidavits or deposition excerpts) but may simply

point out the absence of evidence to support the nonmoving party's case.  *Fairbank v.*

*Wunderman Cato Johnson*, 212 F.3d 528, 532 (9th Cir.2000).  A nonmoving party's failure to

comply with local rules in opposing a motion for summary judgment does not relieve the

moving party of its affirmative duty to demonstrate entitlement to judgment as a matter of law.

*Martinez v. Stanford*, 323 F.3d 1178, 1182-83 (9th Cir. 2003).

"If the moving party shows the absence of a genuine issue of material fact, the non-

moving party must go beyond the pleadings and 'set forth specific facts' that show a genuine

issue for trial."  *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002) (*citing Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986)).  The non-

moving party may not rely upon mere allegations or denials in the pleadings but must set forth

specific facts showing that there exists a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L.Ed.2d 202 (1986).  A plaintiff must "produce at least some significant probative evidence tending to support" the allegations in the complaint.  *Smolen v. Deloitte, Haskins & Sells*, 921 F.2d 959, 963 (9th Cir. 1990).  A court "need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found."  *Carmen v. San Francisco Unified School District*, 237 F.3d 1026, 1031 (9th Cir. 2001).  This is true even when a party appears *pro se*.  *Bias v. Moynihan*, 508 F.3d 1212, 1219 (9th Cir. 2007).

Where the nonmoving party is *pro se*, a court must consider as evidence in opposition to summary judgment all contentions "offered in motions and pleadings, where such contentions are based on personal knowledge and set forth facts that would be admissible in evidence, and where [the party appearing pro se] attested under penalty of perjury that the contents of the motions or pleadings are true and correct."  *Jones v. Blanas*, 393 F.3d 918, 923 (9th Cir. 2004) (citation omitted), *cert. denied*, 546 U.S. 820, 126 S. Ct. 351, 163 L.Ed.2d 61 (2005).

**DISCUSSION**

In order to state an actionable claim under 42 U.S.C. § 1983, two essential elements must be present: (1) the defendant must be a person acting under color of state law; and (2) the defendants' conduct must deprive the plaintiff of his or her constitutional rights.  *Parratt v. Taylor*, 451 U.S. 527, 535 (1981) (*overruled in part on other grounds*), *Daniels v. Williams*, 474 U.S. 327, 330-31 (1986), Crumpton v. Gates, 947 F.2d 1418, 1420 (9th Cir. 1991).

Implicit in the second element is a third element of causation. *See Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 286-87 (1977).  When a plaintiff fails to allege or establish one of the three elements, the complaint must be dismissed.  *Haygood v. Younger*, 769 F.2d 1350, 1354 (9th Cir. 1985).

Plaintiff also must allege facts showing how individually named defendants caused or personally participated in causing the harm alleged in the complaint.  *Arnold v. IBM*, 637 F.2d 1350, 1355 (9th Cir. 1981).  A person will be held to deprive another "of a constitutional right, within the meaning of section § 1983, if he does an affirmative act, participates in another's affirmative acts, or omits to perform an act which he is legally required to do that causes the deprivation of which [the plaintiff complains]."  *Leer v. Murphy*, 844 F.2d 628, 633 (9th Cir. 1988) (emphasis in original) (citation omitted).  The court's inquiry "must be individualized and focus on the duties and responsibilities of each individual defendant whose acts or omissions are alleged to have caused a constitutional deprivation."  *Id.*

A.      **First Amendment – Protected Speech**

Mr. Rivera alleges that the statements he made in the tier meeting to encourage offenders to use the grievance system, statements made by other offenders in the tier meeting, and discussions with staff in RUAC meetings, are all protected speech.  ECF No. 5, at 11.

The First Amendment guarantees that "Congress shall make no law ... abridging the freedom of speech ..." U.S. Const. Amend. 1.  It is well settled that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).  However, "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and

1   rights, a retraction justified by the considerations underlying our penal system." *Id*. at 545-46

2   (internal citations omitted).  Accordingly, a prisoner's First Amendment rights are "necessarily

3   limited by the fact of incarceration, and may be curtailed in order to achieve legitimate

4   correctional goals or to maintain prison security." *McElyea v. Babbitt*, 833 F.2d 196, 197 (9th

5   Cir.1987).

6

7       Mr. Rivera essentially argues that all speech in the tier  and RUAC meetings is

8   protected.  It is undisputed that the tier  representative system, tier  meetings, and RUAC

9   meetings are encouraged by prison administration as a means of facilitating communication

10  between staff and offenders.  *See* ECF No. 48-3, Exhibit 5, Wofford Decl., ¶ 6.  Although

11  Defendant Allen contends that Mr. Rivera did not obtain advance permission to hold the tier

12  meeting, it is undisputed that Mr. Rivera advised Officer McGaffey of the meeting and that

13  Officer McGaffey attended the tier meeting.  There is also a dispute about whether Officer

14  McGaffey spoke at the meeting – he says he did not and Mr. Rivera says that Officer

15  McGaffey also told offenders that they were free to file grievances.  These disputes are not

16  material, however, to the question of whether the First Amendment provides blanket protection

17  for speech that occurs in tier and/or RUAC meetings.  Mr. Rivera provides no authority for his

18  argument that his speech is constitutionally protected simply because it occurred during one of

19  these meetings.

20

21      Even if the Court assumes for purposes of this motion, that all speech in the tier and

22  RUAC meetings was protected, there was a valid, rational connection between the Defendants'

23  regulation (identifying Mr. Rivera's actions in the tier meeting as a security risk) and the basis

24  for the infraction of "inciting or engaging in a group demonstration."

25

26

1    "When a prison regulation impinges on inmates' constitutional rights, the regulation is

2    valid if it is reasonably related to legitimate penological interests."  *Turner v. Safley*, 482 U.S.

3    78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).  Under *Turner,* four factors are to be balanced in

4    determining whether a prison regulation is reasonably related to legitimate penological

5    interests:  (1) whether there is a valid, rational connection between the prison regulation and

6    the legitimate governmental interest put forward to justify it; (2) whether there are alternative

7    means of exercising the right that remain open to prison inmates; (3) whether accommodation

8    of the asserted constitutional right will impact guards and other inmates, and on the allocation

9    of prison resources generally; and (4) whether there is an absence of ready alternatives versus

10   the existence of obvious, easy alternatives.  *Shakurv. Schriro*, 514 F.3d 878, 884 (9th Cir.2008)

11   (internal citations omitted ).

12            Mr. Rivera was infracted for "engaging in or inciting a group demonstration."  ECF No.

13   48-3, at 25.  In the Serious Infraction Report, Officer Townsend stated that "based on

14   information received from IIU DeMars, Offender Rivera told everyone in the pod that unless

15   they ALL grieved the issue, nothing would happen."  ECF No. 48-3, at 27 (emphasis in

16   original).  The CI who attended the meeting told investigators that Mr. Rivera and fellow

17   inmate Swanger did not like what was going on or being enforced by staff and that in addition

18   to telling offenders to file grievances, Mr. Rivera filled out grievances for several other

19   offenders, who just signed their names.  A comparison of hand-writing on the twenty-one

20   grievances filed on the day of the tier meeting revealed that Mr. Rivera authored some of the

21   grievances.  Officer DeMars concluded from this that Mr. Rivera was trying to get the

22   offenders "pumped up" for a collective cause against WCC administration and that some

1  offenders may not have been interested in participating, but did so because Mr. Rivera

2  influenced them.  ECF No. 48-1, Exhibit 3, DeMars Decl., ¶¶ 4, 5.  CUS Allen states that it

3  was her understanding that the conduct "was more than just a number of offenders filing a

4  grievance about the same issue, but that Mr. Rivera and the other offender were getting them

5  wound up and angry."  She ordered that Mr. Rivera and the other offender be placed in

6  administration segregation pending investigation because of the "safety and security concern of

7  this type of organizing."  ECF No. 48-1, Exhibit 2, Allen Decl., ¶ 12.

8

9          Before Defendant Arlow upheld Mr. Rivera's infraction on appeal, she learned that

10  Captain Wofford had been called to Cedar Hall to calm down the offenders who were quite

11  upset following the tier meeting.  Defendant Arlow opines that any time a group of offenders is

12  incited to a negative emotional state of frustration and agitation into considering a collective

13  negative response, a serious risk of a physical response arises, threatening the safety and

14  security of staff and offenders.  She concluded that Mr. Rivera had misused his position as tier

15  representative by inciting the offenders of G/H tiers in such a way.  ECF No. 48-3, Exhibit 6,

16  Arlow Decl., ¶¶ 4-6.

17

18          As a tier representative, Mr. Rivera was to gather the concerns of the tier, like the loss

19  of gym time and change in movement, and take them to the WCC staff at the RUAC meetings.

20  *See, e.g.,* ECF No. 48-1, Exhibit 2, Allen Decl., ¶ 9.  The evidence reflects, however, that Mr.

21  Mr. Rivera actively encouraged the G/H tier offenders to collectively file grievances on a

22  particular issue and in fact, wrote some of the grievances and gave them to offenders to sign.

23  The evidence also reflects that after the tier meeting, the G/H tier offenders were agitated and

24  demanding to speak to someone in administration.  Captain Wofford found the hostility of the

25

26

REPORT AND RECOMMENDATION - 20

group to be very alarming.  According to Captain Wofford, when offenders "are already in this state of agitation and dissatisfaction, it can be easy to incite them to a collective physical reaction. More than three years later, I remember this incident so clearly because the level of anger and frustration of the inmates in G/H dayroom was the type that leads to violence and riots."  ECF No. 48-3, Exhibit 5, Wofford Decl., ¶ 10.

Assistant Secretary Pacholke, who has thirty years' experience in the DOC prison system, identified a security risk related to Mr. Rivera organizing the offenders to challenge the 15 minute reduction in their gym time.  ECF No. 48-3, Exhibit 7, Pacholke Decl., ¶¶ 8-9.  According to Mr. Pacholke, a full unit typically uses the gymnasium at a time, which may include up to 240 offenders.  Thus the offenders would all be in the gymnasium at the same time.  This could very well have led to an overreaction by an offender and/or group of offenders during time in the recreation areas and could have led to a large-scale incident of violent behavior in an area where only two correctional officers were physically present.  Mr. Pacholke emphasized that because the ratio of correctional officers to offenders is high, it is especially critical for staff to manage any negative or aggressive emotionalism of offenders, so that their feelings of anger or frustration do not escalate to physical violence.  Tension among offenders is a constant in prisons and to preserve the safety and security of staff, offenders, and the outlying communities, it is critical to maintain it at a manageable emotional state."  *Id*. at ¶9.

As to the first *Turner* factor, there is a valid, rational connection between restricting Mr. Rivera's conduct during the tier  meeting, *i.e.* urging the G/H tier offenders to file grievances on two specific issues and personally writing out grievances for some of the

offenders, and the asserted governmental interest in maintaining the safety and security of offenders and prison staff.  Mr. Rivera provides no rational basis to conclude that limiting this type of behavior is not connected to the orderly operation of the WCC.  Defendants state that as a result of Mr. Rivera's conduct in the tier meeting, the G/H offenders were agitated and demanding to speak to administration.  Captain Wofford states that they were in a serious state of unease, were throwing their arms in the air, and making comments that implied violence, such as they are going to make us go off" and "you know what can happen if you just keep taking things away from us."  ECF No. 48-3, Exhibit 5, Wofford Decl., ¶¶ 9-10.  It took some time before Captain Wofford was able to calm the offenders down.  *Id.*, ¶ 10.  It is unclear whether the incident described by Captain Wofford occurred on the same day and whether the conduct she witnessed can be directly attributed to Mr. Rivera's actions during the tier meeting.  However, the evidence is relevant to show the type of safety and security risks associated with Mr. Rivera's actions.  The undersigned concludes that a sufficient showing has been made as to the first *Turner* factor and that this factor is determinative.  *See Michenfelder v. Sumner*, 860 F.2d 328, 331, n.1 (9th Cir. 1988) (court need only consider those *Turner* factors that are relevant to the constitutional issues presented because "[s]ubjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration." )

The undersigned concludes that, even if Mr. Rivera's speech during the tier and RUAC meetings can properly be characterized as protected speech, that protection is overcome by Defendants' furtherance of the legitimate penological goal of maintaining the safety and

1  security of offenders and prison staff.  Defendants are entitled to summary judgment on this

2  claim.

3  **B.       First Amendment – Retaliation**

4       In this claim, Mr. Rivera alleges that all of the Defendants retaliated against him

5  because he presented complaints on behalf of other inmates against Officers McGaffey and

6  Townsend at the RUAC meeting, openly criticized CUS Allen on the way she was handling

7  grievances and complaints against staff, and threatened to send a grievance to the captain

8  "informing her of how her staff is misbehaving."  ECF No. 5, at 10.

9

10       It is undisputed that Mr. Rivera has a First Amendment right to file grievances against

11  prison officials and to be free from retaliation for doing so.  *Watison v. Carter*, 668 F.3d 1108,

12  1114 (9th Cir.2012).   However, it is less clear that he has a First Amendment right to present

13  staff complaints on behalf of others.  There is no constitutionally protected right to assist others

14  with their prison grievances.  The United States Supreme Court has limited any right for

15  inmates to provide each other legal assistance to when it is necessary as a "means for ensuring

16  a 'reasonably adequate opportunity to present claimed violations of fundamental constitutional

17  rights to the courts.'"  *Lewis v. Casey*, 518 U.S. 343, 350-351 (1996) (*quoting Bounds v. Smith*,

18  430 U.S. 817, 825, (1977))."  *Shaw v. Murphy*, 532 U.S. 223, 225, n. 3 (2001).   Here, Mr.

19  Rivera was bringing up complaints on behalf of others within a group setting meant to allow

20  inmate tier representatives to bring their complaints to management.

21

22       To prevail on a First Amendment retaliation claim, a prisoner must prove that: (1) he or

23  she engaged in conduct protected under the First Amendment; (2) the defendant took adverse

24  action; (3) the adverse action was causally related to the protected conduct; (4) the adverse

1   action had a chilling effect on the prisoner's First Amendment activities; and (5) the adverse

2   action did not advance a legitimate correctional interest.  *Watison*, 668 F.3d at 1114–15.

3       With respect to the fourth requirement that a plaintiff demonstrate that adverse action

4   chilled the prisoner's exercise of his First Amendment rights, plaintiff "does not have to show

5   that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue

6   'would chill or silence a person of ordinary firmness from future First Amendment activities.'"

7   *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir. 2009) (*quoting Rhodes*, 408 F.3d at 568–69)

8   (emphasis in original).  Alternatively, a plaintiff may allege facts showing that the defendants

9   intended to chill the plaintiff's First Amendment rights.  *Mendocino Env'l Ctr. v. Mendocino*

10  *Cty.*, 192 F.3d 1283, 1300 (9th Cir. 1999).  Finally, in order to survive summary judgment, the

11  plaintiff bears the burden of showing that there was no legitimate penological objective to the

12  defendant's actions.  *See Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995).  A retaliation

13  claim is not plausible if there are "more likely explanations" for the action.  *Iqbal*, 129 S.Ct. at

14  1951; see, e.g., Pratt, 65 F.3d at 808.

15      As noted above, filing prison grievances and lawsuits is clearly protected conduct.

16  Assuming that Mr. Rivera was engaged in protected activity (for all complaints whether made

17  on his own behalf or on behalf of others), he has, nevertheless, not met his burden of showing

18  that his protected activities were "the 'substantial' or 'motivating' factor behind the

19  defendant's conduct."  *Brodheim v. Cry*, 584 F.3d 1262, 1271 (9th Cir.2009) (quotation and

20  citation omitted).

21      Mr. Rivera argues that Defendants McGaffey, Townsend, and Allen, only brought

22  charges against him "after they were informed of the grievances presented against them by

REPORT AND RECOMMENDATION - 24

1    plaintiff, this included plaintiff's grievance against Allen for not acting on staff grievances."

2    *See,* ECF No. 51, at 14.  Certainly, timing can properly be considered as circumstantial

3    evidence of retaliatory intent.  *Pratt v. Rowland*, 65 F.3d 802, 808 (9th Cir.1995); *see also*

4    *Watison*, 668 F.3d at 1114.   However, there is no evidence that Defendants McGaffey and

5

6    Townsend knew that it was Mr. Rivera who was the inmate who complained about them to

7    CUS Allen.  Thus, there is no evidence of a causal connection between his personnel

8    complaints in the RUAC meeting and the Defendants' actions.  The evidence reflects only that

9    Mr. McGaffey attended the tier meeting and wrote an incident report detailing what occurred

10    in that meeting.

11      In addition, Mr. Rivera has failed to carry his burden of showing that there was no

12    legitimate penological objective to the Defendants' actions.  As noted above, a retaliation

13    claim is not plausible if there are more likely explanations for the actions.  Defendants have

14    produced evidence showing that their response – segregating, infracting, and sanctioning Mr.

15    Rivera – advanced the legitimate penological goal of preserving the safety and security of

16    WCC inmates and staff.  Experienced prison officials believed that Mr. Rivera's

17    encouragement of the G/H tier offenders to collectively grieve specific issues when they were

18

19    already disgruntled about the loss of special privileges could result in a physical confrontation

20    or riot.

21      Based on the foregoing, the undersigned concludes that Defendants are entitled to

22    summary judgment on Mr. Rivera's retaliation claim.

23

24 **C.**      **Due Process**

25

26

1   Mr. Rivera alleges that his due process rights were violated because, at the time Ms.

2   Arlow ruled on his appeal, she was aware that Officer McGaffey had attended, supervised, and

3   assisted at Mr. Rivera's tier meeting and that the tier meeting had been authorized by Officer

4   McGaffey.  He alleges further that Ms. Arlow then changed the charge against him from

5   "having an unauthorized meeting" to "telling inmates to grieve issues" and found him guilty

6   without having a new hearing on this "new charge."  ECF No. 5, at 7.

7   

8   The Due Process Clause provides that a person shall not be deprived of life, liberty or

9   property without due process of law. U.S. Const. Amend. XIV.  "A section 1983 claim based

10  upon procedural due process has three elements: (1) a liberty or property interest protected by

11  the Constitution; (2) a deprivation of the interest by the government; (3) lack of process.  The

12  Due Process Clause does not create substantive rights in property; the property rights are

13  defined by reference to state law." *Portman v. County of Santa Clara*, 995 F.2d 898, 904 (9th

14  Cir. 1993).  To establish a due process violation, a plaintiff must first demonstrate he has been

15  deprived of a protected right or interest.  *See Olim v. Wakinekona*, 461 U.S. 238, 250 (1983);

16  Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex, 442 U.S. 1, 11 (1979).

17  If a plaintiff cannot show the deprivation of a protected interest, there is no right to due

18  process.

19  

20  Prison inmates facing disciplinary proceedings where state created liberty interests are

21  at issue do not enjoy the full panoply of due process safeguards.  *Wolff v. McDonnell*, 418 U.S.

22  539 (1974).  In Washington, if the loss of good conduct credits is a sanction, a state-created

23  liberty issue is at stake.  Hence, such inmates are entitled to: (1) written notice of the charges

24  against them at least 24 hours in advance of the hearing; (2) an opportunity to call witnesses

1   and present documentary evidence in their defense, provided that doing so will not be unduly

2   hazardous to institutional safety or correctional goals; and (3) a written statement of the

3   evidence relied upon and the reasons for the Hearings Officer's findings.  *Wolff*, 418 U.S. at

4   563-66.

5          The record reflects that Mr. Rivera received all due process to which he was entitled.

6   He received written notice, an opportunity to call witnesses and evidence, and a written

7   statement of the evidence relied on and reasons for Officer Dunnington's findings.  He does

8   not argue otherwise.  Instead, he argues that at the time Ms. Arlow ruled on his appeal, she was

9   aware that Officer McGaffey had authorized the tier meeting and had attended, supervised, and

10  assisted at the tier meeting.  He alleges that Ms. Arlow then changed the charge against him

11  from "having an unauthorized meeting" to "telling inmates to grieve issues" and found him

12  guilty without having a new hearing on this "new charge."  ECF No. 5, at 7.

13         The infraction records do not support Mr. Rivera's claim that the original 652 infraction

14  was ever amended.  ECF No. 48-3, Exhibit 9, Dunnington Decl., Attachments A and B, and

15  Exhibit 6, Arlow Decl., at Attachment A.   During his deliberations at the end of the infraction

16  hearing, Defendant Dunnington contacted CUS Allen and received information from her that

17  Mr. Rivera had not followed procedure in how he called his tier meeting.  ECF No. 48-3,

18  Exhibit 9, ¶ 4.  Defendant Dunnington states that CUS Allen also stated that "Mr. Rivera's

19  actions and words toward the other inmates in the day room had them very agitated against

20  staff and the WCC administration" and that "[t]his information, in combination with the

21  infraction report, demonstrated a type of activity that could cause a serious incident of a group

1   of agitated inmates out of control and, therefore, a serious threat to the safety and security of

2   WCC inmates and staff." *Id.*

3        It is undisputed that Mr. Rivera did not have an opportunity during his hearing to

4   respond to statements made by CUS Allen in the telephonic interview.  However, it is also

5   undisputed that there was no new charge and that Mr. Rivera's alleged failure to follow the

6   procedure in scheduling the tier meeting was the primary reason for finding him guilty of the

7   infraction.  In addition, this issue was raised and essentially neutralized during Mr. Rivera's

8   appeal of the infraction.  ECF No. 51-1, at 62-65.  Associate Superintendent Arlow considered

9   Mr. Rivera's argument that he had been infracted for holding an unauthorized meeting and not

10  for "engaging in or inciting a group demonstration."  She spoke to C.O. Dozier about the issue

11  and noted that C.O. Dozier "explained to me that he had told the tier reps the day before to

12  have a meeting at the times they would normally."  ECF No. 48-3 at 11.  She did not refer to

13  the meeting as unauthorized nor does she appear to have relied on such a finding for her

14  decision.  In her responses to discovery, Ms. Arlow stated:  "Mr. Rivera was found guilty of

15  violating WAC 652, 'engaging in or inciting a group demonstration' … the 'charge' or

16  infraction was not changed….  He was never infracted for having an unauthorized meeting as

17  that would have been a violation of WAC 708 – Organizing or participating in unauthorized

18  group activity or meeting."  ECF No. 51-1, at 47-48.

19       The Disciplinary Hearing Appeal Decision confirms that the manner in which Mr.

20  Rivera held the January 19th tier meeting was not at issue.  Mr. Rivera made the following

21  appeal:

22       The facts given to the Hearings Officer were wrong.  You were infracted for
         conducting a tier meeting without authorization and without an officer present.

1

According to your appeal, the meeting WAS attended by CO McGaffey and that

2

CUS Allen failed to ask if a CO was at the meeting.  It was authorized by CO

Dozier at an earlier morning meeting.  No rules were broken and all policies

3

were followed.

4

Ms. Arlow investigated the appeal of the 652-infraction, and found the following:

5

In reviewing your infraction and appeal paperwork, I called and talked to

6

Officer Dozier.  He explained to me that he had told the tier reps the day before

to have a meeting at the times they would normally.  However, based on

7

information received by IIU DeMars, it was said that you were telling everyone

in the pod that unless they grieved the issues (1. Trying to get back the 15

8

minutes of gym.  2.  Movement from activities to gym when gym is called),

nothing would happen.  I also talked to Captain Wofford, who said she was

9

requested to come to Cedar and talk to everyone in an effort to calm offenders

down.  Your actions could have caused serious safety and security issues.  The

10

sanctions are upheld.

11

ECF No. 48-3, Exhibit 6, Arlow Decl., at Attachment A.

12

Based on the foregoing, the undersigned finds that Defendants did not violate Mr.

13

Rivera's due process rights during his infraction hearing.

14

15

**D.      Personal Participation – Defendant Waddington**

16

Defendants argue that Mr. Rivera's claims against Defendant Waddington must be

17

dismissed because they are based on a theory of respondeat superior or vicarious liability.[2]

18

Defendants in a 42 U.S.C. § 1983 action cannot be held liable based on a theory of

19

respondeat superior or vicarious liability.  *Polk County v. Dodson*, 454 U.S. 312, 325 (1981);

20

*Bergquist v. County of Cochise*, 806 F.2d 1364, 1369 (9th Cir. 1986). "At a minimum, a § 1983

21

plaintiff must show that a supervisory official at least implicitly authorized, approved, or

22

23

24

25

[2] Defendants also contend that claims against Defendant McGaffey should be dismissed because Mr.
Rivera has failed to establish that Defendant McGaffey took any adverse action against him.  This is part of the
Court's discussion regarding Mr. Rivera's retaliation claim.

26

1   knowingly acquiesced in the unconstitutional conduct." *Bellamy v. Bradley*, 729 F.2d 416,

2   421 (6th Cir. 1984), cert. denied, 469 U.S. 845 (1984).

3          Doug Waddington was employed by the DOC as Superintendent of WCC from August

4   1, 2006 until October 1, 2010.  He has no recollection of participating in or having knowledge

5   of the investigation and proceedings regarding the January 19, 2010 infraction issued to Mr.

6   Rivera.  Mr. Rivera's infraction was reviewed by Mr. Waddington's designee, Associate

7   Superintendent Kerry Arlow.  ECF. No. 48-3, Declaration of Doug Waddington; ECF No. 53-

8   1, Supplemental Declaration of Doug Waddington, ¶¶ 2,3.

9

10         According to Mr. Waddington, the superintendent is not involved in classification

11  decisions and he was not involved in any increase in Mr. Rivera's custody level.  ECF No. 53-

12  1, Exhibit 1, Waddington Suppl. Decl., *Id.*, ¶ 4.  After a search of WCC records, Mr.

13  Waddington confirms that Mr. Rivera sent him an e-mail in March, 2010.  However, the e-mail

14  was answered by Cher Griffin, Mr. Waddington's former secretary.  *Id.*, ¶ 5.  Ms. Griffin states

15  that her name after Superintendent" on the "From" line of the email indicates that she sent it

16  from her kiosk email account.  As Mr. Rivera's question was about a pending transfer, she

17  would likely have contacted the Correctional Program Manager (CPM) and then included the

18  CPM's answer in her reply to Mr. Rivera's email.  She states that because she replied to the

19  email in this manner, it is extremely unlikely that Superintendent Waddington knew anything

20  about Mr. Rivera's email at the time.  ECF No. 55-1, Exhibit 2,  Declaration of Cheryl E.

21  Griffin), ¶¶ 3, 4 and Attachment A.

22

23         Mr. Waddington also has no independent recollection of receiving letters from Mr.

24  Rivera in January 2010 (one receipt stamped by the Superintendent's Office and two receipt

25

26

1   stamped by the Hearings Office).  He believes that it is likely that Associate Superintendent

2   Arlow considered the letters when she handled Mr. Rivera's appeal.  ECF No. 53-1,

3   Waddington Suppl. Decl., ¶ 6.

4       The summary judgment evidence does not support a claim that Defendant Waddington

5   was personally involved in the alleged deprivation of Mr. Rivera's constitutional rights nor in

6   the alleged unlawful conduct of his subordinates.  He cannot, therefore, be held liable under ¶

7

8   1983.

9   **E.     Qualified Immunity**

10      Under the doctrine of qualified immunity, prison officials are "shielded from liability

11  for civil damages insofar as their conduct does not violate clearly established statutory or

12  constitutional rights of which a reasonable person would have known."  *Harlow v. Fitzgerald*,

13  457 U.S. 800, 818 (1982).  A civil rights plaintiff opposing a claim of qualified immunity must

14  establish the existence of a constitutional violation, clearly established law to support the

15  claim, and that no reasonable official could believe their conduct was lawful.  *Pearson v.*

16

17  *Callahan*, 555 U.S. 223 (2009); *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Siegert v. Gilley*,

18  500 U.S. 226, 232 (1991).

19      As the Court has concluded that Mr. Rivera has failed to raise material issues of fact

20  relating to his constitutional claims, it is not necessary to address the question of qualified

21  immunity.

22

23                                    **CONCLUSION**

24      Based on the foregoing, the undersigned recommends that Defendants' Motion for

25  Summary Judgment (ECF No. 48) be **GRANTED;** that Plaintiff's Motion for Summary

26

1   Judgment (ECF No. 51) be **DENIED;** and that Plaintiff's claims against Defendants be

2   **dismissed with prejudice.**

3          Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil

4   Procedure, the parties shall have fourteen (14) days from service of this Report to file written

5   objections.  See also Fed. R. Civ. P. 6.  Failure to file objections will result in a waiver of

6   those objections for purposes of appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985).

7   Accommodating the time limit imposed by Rule 72(b), the Clerk is directed to set the matter

8   for consideration on **June 14, 2013**, as noted in the caption.

9

10          **DATED** this  30th  day of May, 2013.

11

12

13                                          Karen L. Strombom
                                           United States Magistrate Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

REPORT AND RECOMMENDATION - 32